**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

DAVID CORWIN,

                    Defendant

0207 2:21CR00218-001(JS)

---

**COMBINED OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT**
**AND SENTENCING MEMORANDUM ON BEHALF OF DAVID CORWIN**

Dated:  Mineola, New York
            October 27, 2022

**ANTHONY M. GRANDINETTE, ESQ.**
*Attorney for Defendant(s)*
114 Old Country Road, Suite 420
Mineola, New York 11501
Telephone: (516) 877-2889
Email: grandinettelaw@gmail.com

## INTRODUCTION

1.      David Corwin's guilty plea for the offense, 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1)
- Receipt of Child Pornography (Class C Felony) and subsequent conviction has been an extremely
difficult experience for him thus far. He stands before the Court nervous and frightened given his
background and the anticipated challenges before him - both humbled and ashamed for his
misjudgments, fearful of what lies ahead, and remaining hopeful the Court and corrections system,
will understand the unique set of circumstances presented in his case.

2.      Although Mr. Corwin has personal issues to note, he was fully cooperative with
law enforcement's investigation and inquiries, has been forthright in his explanation of all
background information, and asks the Court's acknowledgment of his personal plight over many
years -- the sincere remorse and reflection this has prompted, his acceptance of responsibility for
his actions, and his efforts toward repairing over two decades of devasting difficulties spawned by
family disfunction and parental abuse.

3.      The prospect of imprisonment and what lies ahead is overwhelming to Mr. Corwin.
The prospect of imprisonment presents a very harsh environment starkly contrasted with his last
twenty plus years living as a recluse. It is daunting for him Your Honor, but he is here to answer
and accept the Court's judgment. The offense detail is not in any manner taken lightly and its
seriousness has registered. Of note, I have also had several opportunities to communicate in detail
with the AUSA's office and USPO regarding relevant background in this case, and this has been
very much appreciated.

4.      The defense acknowledges the PSR in Offense Level Computation at page 8
concludes Mr. Corwin's final adjusted offense level under the United States Sentencing Guidelines
as 34, and that resulting advisory Guidelines range is 151 to 188 months' imprisonment – with
statutory provisions noting a five to twenty-year period of custody. In plea related discussions

however, the Government and defense counsel have contemplated the statutory minimum sentence of five years imprisonment (w/USPOs noting the same appropriateness given the circumstances).

5.      My June 11, 2021, request to the government to consider a Rule 11(a)(c)(1) plea to 'possession' instead of 'receipt' of Child Pornography, thereby negating a mandatory minimum (and ideally a sentence of 18 months in result) was noted - but the request was unfortunately declined. In light of this defendant's background, presented in great detail throughout various materials submitted to the Court, it is clear through all assessments that a five-year minimum period of prison will quickly take a significant toll on this particular individual. A five-year sentence seems lengthy and harsh beyond the more typically situated, especially due to Mr. Corwin's age (74) and longtime physical and mental health.

6.      Generally regarding offense level calculations: "[i]t is now . . . emphatically clear that the Guidelines are guidelines - that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). They "now serve as one factor among several courts must consider in determining an appropriate sentence" that is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90, 101 (2007) (internal quotation marks omitted). And when the Guidelines "run amok" courts "place greater reliance on . . . ***section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences***." *U.S. v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

7.      Accordingly, Mr. Corwin submits this sentencing memorandum to assist the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a) —maintaining that a more lenient sentence is called for in the case of David Corwin as further described in the pages below. Mr. Corwin has been on bond under Pre-Trial Supervision since his arrest without any real issues. David's personal circumstance have improved greatly since his arrest. In large measure, based

upon the opportunity for counseling and abstinence of mind-altering substances post arrest, made possible through this Court and pre-trial supervision (and is documented for the Court). With a lot on his plate since this began, Mr. Corwin is trying to cope with it all and slowly takes careful measure to comply with all that has been and is to be required.

8.      David's significant personal difficulties began in his childhood years; they manifested over 20 years ago to a reclusiveness for two decades now; the enormous hardship and dramatic changes anticipated with imprisonment[1]; straight from an isolated existence in his home for more than twenty years, to a federal prison compound and jail cell, with what will be truly nefarious characters as his bunk mates. David's own volatility and ability to focus and endure will certainly be tested.

9.      The defense is not making light of the offense, nor the reality of the individual who committed it - just a focus on the uniquely concerning background of it all (as well as what is to be expected).  It is unquestionably a continuing structure of serious counseling that is needed here to support objectives of sentencing - and a realization of the offense circumstance and actual threat to community.

10.     EDNY USPOs note in their sentencing recommendation to the Court: "*60 months custody (statutory minimum); a \$35,000 fine, due immediately at the time of sentence and payable in full; and five years' supervised release (mandatory minimum)."* We thank EDNY POs (and AUSA) for their thorough and detailed review of pertinent case background, and we realize the gravity of both the statutory minimum sentence in addition to the offense particulars. Mr. Corwin's personal condition should be considered in any scenario, however, and is key to fully understanding how this all occurred, and therefore a subsequent commensurate punishment

---

[1] In his August 2022 Monthly Treatment Report from First Light Psychological Services, Inc., David's counselor notes "[t]he client anticipates going to prison[sic] and wonders if his medical condition will result on[sic] passing while in prison." Discussed more fully *infra*.

level best serving the interests of justice, as well as the plight of a uniquely isolated and withdrawn man.

### A.   Personal History - Education/Employment - Community Involvement

### I.   Family Background

11.   *Of note - the PSR and various psychological background reports submitted also provide great detail with regards to David Corwin's personal background and family history.*

12.   David Corwin is 74 years old born April 13, 1948, in Greenport, New York through the marriage of Ruth Mildred (nee) Carman and Barton Boissean Corwin. He was raised by his parents (both currently deceased) in a middle-class household. David has lived in Greenport his entire life (except for briefly in Florida). His mother died in March 1978 (age 68) from breast cancer. She was retired from a career as a registered nurse supervisor at Eastern Long Island Hospital (nightshift) and by all accounts a good Mother to her children. Mr. Corwin's father died in 1964 (age 58) from a heart attack. His father worked as a union carpenter and is remembered most as being an alcoholic, who was extremely abusive to his family over the course of his lifetime, with devasting impact to the defendant.

13.   David has one sibling, a brother Kirby (71-years-old). Kirby Corwin is married, works as a fisherman and a carpenter and lives far away in Seldovia, Alaska. David's relationship with his brother is quite estranged at present. Conflicts with their father over the years created animosities that still linger. David suffered much of their father's disdain while Kirby suffered none. Verbal abuse from his father was hurtful and damaging. Constant insult, criticism and not just lack of encouragement, but a pile on of 'discouragement' - taking his demons out on his wife and David. Although not religiously devout, David's mother tried to maintain a Methodist faith instilled in her children along the way. His mother worked the night shift at Eastern Long Island Hospital, taught Sunday School and attended church on Sundays. Although David's mother

4

provided some structure in the home, and things appeared "normal" to the outside world, his family life was completely dysfunctional and secretive. In 1960, few aired their dirty laundry in public, nor pursued therapy or divorce, which was socially unacceptable at the time, so the family secrets were just that—secret.

14.     The abuse from his father began when he was six years old and continued unabated until his father's death in 1964 – a span of 10 years. Any support or guidance David so desperately needed during these formidable years (ages 6-16), was never forthcoming. Feeling intensely stigmatized, David tried keeping the abuse as secretive as he could, ashamed and withdrawn. Sadly, the first counseling/treatment David ever received to attempt to work through these psychological/emotional issues occured after his arrest in this case. Only now has he begun dealing with childhood anxieties, trauma and depression that manifested into a reclusive existence for decades and the sad debacle before us today - and it is certainly going to be a long road ahead for David.

15.     The lengthy, consistent and sustained abuse David suffered had a permanent and lasting damaging effect. His father was perpetually drunk, had been fired for drinking on the job, and on a daily basis delivered a nightmare to this family resulting in David's early development of terrible social anxieties and overwhelming feelings of inadequacy that quite tragically lasted a lifetime. David's had very few (fleeting) friendships if any - in younger years he avoided bringing any friends to his home as his father would only berate him in front of them. Mr. Corwin's father would routinely humiliate him in front of his peers by ridiculing him and by calling him stupid, a mistake, good for nothing, etc. David learned to avoid being humiliated, and eventually disappeared into a shell of himself tucked away alone, and irreparably damaged long term.

16.     David points to his mother's wherewithal and strength with her children as his sole emotionally warm memory growing up. He distinctly remembers instances of domestic violence

from his father and the abuse toward his mother. His father was an alcoholic, intoxicated the majority of the time, and when his mother retired from nursing, ironically, she became an alcoholic in the fallout of it all too. Not surprisingly, David's brother is also noted to have alcohol difficulties of his own, as alcoholism affects the entire family.

17.     David's mother passed away in 1978, his brother left for Alaska shortly thereafter, and David's lived alone in the family home ever since.[2] Both he and his brother are owners of the residence. The family home remains virtually unchanged since David was a child, the interior and exterior remain original. Upon inspection it's briefly described as follows (PSR p10 par 47): "*The home contains numerous rooms, most of which are unused and cluttered with old belongings and electronics.*" Sadly, it has been a disarranged, solemn existence within those walls for David all these years.

18.     David has never been married. Has no children. There are no 'romantic relationships' to speak of (other than a few brief relationships over 20 years ago). David has been socially isolated for a long, long time. His hobbies and pastimes basically include 'working around the house' and managing the various rental properties he owns in Greenport. David notes he also likes to follow the news and routinely track the stock market. His PSR (pp 21-23, par 78-79) review his assets and finances in detail and can be fully noted there.

19.     David worries greatly over logistics and ability to manage the rental incomes during an absence, in addition to the harsh reality of a change in status with his social security payments being suspended during his time in prison.[3] The loss of disability payments, coupled with the lack of support available to help maintain his personal and rental properties has created tremendous

---

[2] 639 Main St. Greenport, NY 11944
[3] https://www.ssa.gov/pubs/EN-05-10133.pdf

daily anxiety for Mr. Corwin. He is in constant fear that upon his release, there may not be much to come back to depending on the length of his sentence.

## II.   Educational Background

20.     Mr. Corwin attended grade school, junior high and high school within the Greenport Union Free School District. He graduated Greenport High School in June 1966. Overall, he had a hard time maintaining his grades given the overwhelming struggles at home and was generally lethargic in approach to his classes. There was not any real encouragement from home for excelling with education (his mother did her best) and there were many hard days. His grades were generally poor. David always had a lot on his plate as a child into adolescence (weighing him down) in comparison to his peers, and it seemed never ending for him.

21.     In September 1966, after graduating High School, David enrolled at Suffolk Community College (Selden NY) and in December 1968 earned an Associate's of Science Degree in Marine Technology. In 1972 David was able to attend the University of Miami (Coral Gables FL) for one semester. Short on funds to continue his education, David returned to Long Island to work in order to gather resources. From 1973 onward, David would work for the funds necessary to continue his university studies, and in May 1976, he would graduate from University of Miami with a Bachelor of Science in Civil Engineering. After graduating, David moved back from Florida, briefly to Mineola upon arrival, and then on to the family home in Greenport shortly thereafter. David then worked from 1976 to 1993 until medically diagnosed as disabled and unable to work.

## III.   Professional Career & Employment

22.     Between 1976 and 1993 Mr. Corwin primarily held employment in the capacity of a Civil Engineer. His very first job, in 1969, at age twenty-one, was working for the Suffolk County

Health Department as an environmental health technician. He left that job to further his college studies. David was industrious and hard working. When he was not in classes during a semester (or between) he would take work building docks and bulkheads (or sign on for anything available in order to have the money to continue school). In 1976, after graduating from the University of Miami, he obtained employment as a Civil Engineer designing sewer collection systems for Gibbons and Highland in Nassau County. With his mom's passing in 1978, David then began work as an engineer for Lizza Industries (also in Nassau County).

23.       The long commute back and forth from Greenport all the way to Nassau County for work eventually became too much (w/David also now having difficulties with his medically symptomatic issues that would progressively worsen). David resigned from Lizza Industries in 1981. By 1981, David had also been doing work for a friend in the construction field, and eventually became self-employed for a short period doing various contracted carpentry projects locally. David's average salary for these years 1976 thru 1985 usually averaged between $400 to $500 gross pay per week.

24.       From 1985 thru 1993 David worked full time for L.K. McLean Associates in Brookhaven NY with a $50,000 annual salary. He experienced further medical/psychological difficulties in early 1989, but was eventually able to return to work through 1993, prior to his medical issues then making it impossible for him to physically and mentally maintain any consistent work and employment. Mr. Corwin has not had paid employment since 1993. He has since been reliant on the approved Social Security disability benefits received for his diagnosed medical condition (reviewed in detail below). David has officially been considered disabled for many years now. Of note: he has consistently filed his tax returns year after year - and as per NYS Dept of Education Office of Professions, David remains registered as a professional engineer in the State of New York through March 31, 2024.

### IV.    Community Involvement

25.    David has been a longtime member of the Greenport Village Zoning Board of Appeals, also a Village Trustee, and involved with many local government projects over the years. The Zoning Board and Trustees met once a month for a few hours and Mr. Corwin attended most relevant meetings. David was also on the Greenport Conservation Advisory Council and member of the Stirling Historical Society of Greenport. His volunteer work[4] with the village was generally limited in scope (mostly due to David's personal circumstance), but he performed his civic duties enthusiastically and responsibly, because he truly loves his hometown. His time in these local endeavors was always voluntary and uncompensated, aside from an initial salaried position through 1991, that ended with the advent of Mr. Corwin's medical decline. He was always drawn to unselfishly dedicating himself to worthy goals and efforts and sincerely worked hard to serve the betterment of the local Greenport community.

26.    The PSR Addendum (with detail provided by defense counsel) accurately notes the positions and timelines of Mr. Corwin's work with Greenport Village. Mid to late 1980s: Member/Chairman Village of Greenport Planning Board; April 1987-April 1991: Elected Village of Greenport Trustee (w/modest salary). After time dealing with medical issues, fast forward to April 2007 thru April 2008: appointed to a one-year, unpaid position as Village Trustee again. Personal adjustment and progress now inching forward. April 2010 thru April 2021: Board Member Village of Greenport Zoning Board of Appeals (unpaid/voluntary) work and efforts toward the consideration and analysis of properly granting zoning variances.

27.    From April 2010 to April 2021 David was on the Village of Greenport Conservation Advisory Council (voluntary/unpaid) focusing on the review of wetlands applications and making recommendations to the Village Board. April 2013 until March 2021: Trustee with the Stirling

---

[4] It should be noted that Mr. Corwin received a modest salary as an elected Village Trustee between 1987-1991.

Historical Society working with their building and grounds committee on many tasks and contributions ... water issues at Berger House, a new furnace and repairs at Ireland House, a whaling display to enhance the remembrance of local history ... sometimes paying for laborers involved with these projects out of his own pocket.

28.     David held these community positions proudly and unselfishly contributed to the Village of Greenport for many years. PSR p19, par 74 notes the March 24, 2021, Suffolk Times article regarding Mr. Corwin, his Trustee position, and the fallout from this offense.[5] The article reviews David's resignations and stepping down from all village related positions due to the arrest (respectfully providing the Mayor with advance notice prior to arrest), all which broke his heart deeply and personally (not to mention the absolute public humiliation of it all) and the wide public knowledge now of his life's sad details, family history, personal difficulties, and the inner demons he tried so hard to just keep hidden to himself.

29.     While working with the Stirling Historical Society, David partnered in a project and co-authored a book titled "Greenport in Postcards" (Arcadia Publishing), a pictorial archive presenting a visual (and descriptive) history of Greenport, New York.[6] **It must be strongly noted that David's contributions to community have been very significant and meaningfully lasting in a tangibly positive manner.** Regardless of current circumstance in this case, the Village of Greenport is in fact a better place today for David's long-term commitment. Leaving it behind on this note of despair and shame was never anything David could have possibly imagined happening.[7]

---

[5] https://suffolktimes.timesreview.com/2021/03/greenport-village-official-arrested-on-child-pornography-charge/
[6] https://www.amazon.com/Greenport-Postcard-History-David-Corwin/dp/1467120324
   https://suffolktimes.timesreview.com/2013/12/postcards-illustrate-greenport-history-in-new-book/
[7] See Exhibit A for a History of Mr. Corwin's contributions to the Village of Greenport with the dates of service and brief description of duties performed.

**B.** **Medical Condition / Psychiatric Evaluation and Assessment**[8]

30. Medically, Mr. Corwin has been diagnosed and treated for Chronic Fatigue Syndrome (hereinafter "CFS"), since March 1983. Regarding his sexual activities, he has erectile dysfunction and an extremely low sex drive. States of anxiety have hampered him all his life, always shy and guarded, interpersonal skill lacking, levels of personal isolation still strongly present (having only worsened over the years). As an adult he has suffered from CFS for 39 plus years and of late is now suffering from some associated essential tremors. Mr. Corwin has also had recent eye surgery for the purposes of fully restoring his vision, which have been initially slow to produce results, but are still being monitored.[9]

31. Of important note, CFS was perhaps a debated area of medicine in years past but today is widely accepted by the medical community as the real affliction that it is -with debilitating effects– and also by the insurance companies who pay for the medical costs involved. To those critical of CFS as a legitimate affliction today, given the clear consensus and treatments in progress toward alleviating such, I respectfully encourage further research on their part – and to be sure to have most fully delved into an individual's case background prior to discounting the possibility.

32. Also of note – defense counsel has made every effort to track down accurate and reliable medical documents and history regarding Mr. Corwin. Unfortunately, given that Mr. Corwin's treatment dates back 40 years, it has been quite frustrating to obtain documentation. Yet

---

[8] Psychiatric/Psychological assessments referenced in this section are available for the Court's review at Exhibit B, Dr. Berill and Exhibit C, Dr. DeSantis.

[9] Mr. Corwin underwent eye surgery (both eyes) in May 2021 with Dr. Lawrence Buono (Southold, NY) to remove cataracts found in each of his eyes by the optometrist during an appointment to address difficulties reading and seeing clearly. Unfortunately, the surgery has not produced ideal results (quite disappointing and no improvement). He is currently prescribed Restasis eye drops for continuing dryness. Mr. Corwin wishes to consult with physicians further as he suspects his compromised vision is due to 'sebaceous cysts' on his eyes that he's suffered with in past years. Mr. Corwin notes he currently has a level of double vision approximately 75% of the time, and he presently finds it "difficult" to read.

an established record, with a current diagnosis of CFS, is present and established and the defense is thankful to have that for Your Honor's review.[10]

33.     The underlying problems of chronic fatigue, depression, anxiety, deep rooted psychological issues (and serious drug abuse as an added factor) all combine to slowly and progressively isolate and put someone down (in a complicated and layered manner) and where it is hard to grasp the proposition of further isolation in prison as any answer to something like this. Mr. Corwin's essentially total 'disability' dates back almost 40 years and whether it's 18 months or 5 years as his sentence, the time in prison will realistically add nothing rehabilitative or constructive to what's actually needed here both medically and psychologically speaking.

34.     Mr. Corwin is presently being cared for by Dr. James Hess, D.O. at Stony Brook Endocrine Consultants, Hauppauge NY (there are no medications specifically available to treat CFS). By 1990 Mr. Corwin had been completely subjugated by the fatigue and consulted with a litany of physicians until discovered to have CFS by Dr. Lloyd Simon upon consultation with Dr. Paul Cheney, Asheville NC (a pioneer in CFS). The most recent documentation from treating physician Dr. Lloyd Simon (2/29/03) reflects his treatment of Mr. Corwin's CFS for ten years prior.

35.     Noting directly from Mr. Corwin's PSR (p12, par 52):

"The defendant advised that he has experienced tremors since approximately 2012. He noted that the tremors "started out as mild vibrations while [he] was lying in bed and advanced to the point of noticeable head tremors." The defendant believes the tremors are attributed to chronic fatigue syndrome. As verified by records from South Shore Neurologic Associates, P.C., in Patchogue, New York, the defendant was diagnosed with "essential tremor" by Dr.

---

[10] In a letter dated June 16, 2022, I chronicled the medical history of Mr. Corwin's CFS diagnosis for PO Giblin with exhibits. That medical history included the diagnosis and prognosis of Dr. Lloyd Simon, Mr. Corwin's primary physician, the Social Security Administrations finding of Corwin's total disability in 1994 and several independent medical examinations performed by experts on behalf of private insurance carriers who examined Mr. Corwin. *See* Exhibit D.

Norman Pflaster in June 2021, and he was prescribed Neurontin (an anti-epileptic drug). According to the records, by September 2021, the defendant stopped taking Neurontin because he felt it was causing vision issues and other side affects.  The defendant indicated that he is not currently taking any medication for his tremors, though they continue to affect him."[11]

36.    Noteworthy from the formal Addendum to the PSR:

"With respect to the defendant's health, Defense Counsel asserted that the defendant's diagnosis with chronic fatigue syndrome has been verified by recent documentation. Specifically, he submitted a recent bill from Stony Brook University Hospital which contained an "Order Requisition" for a panel of blood tests ordered by the defendant's treating physician, Dr. James Hess, on January 3, 2022.  As Defense Counsel points out, 'the order requisition clearly states Mr. Corwin's medical diagnosis as 'Chronic Fatigue Syndrome.'" Defense Counsel added the following:"

'*In a recent telephone conversation with Dr. Hess' office, I was advised that one of two physicians, Dr. Wilson Sze, in his busy two-man practice, Stony Brook Endocrine Consultants, recently left the office, so Dr. Hess was extremely busy. His staff asked me to be patient for a response from him. At least this explains why neither of us have heard back. However, Dr. Hess' diagnosis is clear from his order. Notwithstanding, l will keep you advised on my progress in this area.*'[12]

37.    On August 5, 2022, Dr. Hess did formally respond in writing to a request for a report as to David Corwin's diagnosis and prognosis, as follows:

"*I am writing regarding my patient David Corwin, date of birth 4/13/48. The patient has a long-standing history of chronic fatigue syndrome, first diagnosed in 1983. He continues to have*

---

[11] Mr. Corwin was prescribed Gabapentin (Neurontin) for his tremors by Dr. Norman Pflaster. Unfortunately, the warning label for this medication states it can, and in David's case did cause depression, fear and feelings of sadness, "[c]all doctor immediately if sad, depressed or fearful". An additional side effect of Gabapentin is blurred vision which Mr. Corwin experienced when taking the medication. https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/side-effects/drg-20064011.

[12] Dr. Hess did eventually provide a follow up letter to counsel 8/5/22 noted further below in this memorandum.

*episodic severe fatigue requiring full bed rest for 3-4 days out of every week. He has been evaluated by multiple medical specialists, who will confirm the diagnosis of chronic fatigue syndrome. The chronic fatigue syndrome in this patient does represent a complete disability, as it would prevent him from doing most activities, including activities of daily living several days out of every week." See Exhibit E.*

38.    Also as earlier noted in direct correspondence with AUSA and staff: Mr. Corwin's Chronic Fatigue Syndrome has significantly impacted his entire life, greatly contributing to his isolation, severe depression, avoidance disorder and feelings of inadequacy. Mr. Corwin spent much time in an online chat group for CFS suffers at Reddit.com.[13] Chronic Fatigue Syndrome is a debilitating disease with no known cause and no known cure.[14] Interestingly, Chronic Fatigue Syndrome is currently being associated with long term Covid patients because both patients suffer similar symptomology, e.g., See, National Library of Medicine.[15] The government has recently allocated funding into the study of long term Covid and Chronic Fatigue Syndrome. Insight into the personal suffering of individuals with Chronic Fatigue Syndrome can be gained by perusing posts of CFS suffers at Reddit.[16]

**NY Center for Neuropsychology/Forensic Behavioral Science: N.G. Berrill, Ph.D. Consulting Forensic Psychologist Director - 9/2/21 and 9/29/21 - Referred by A. Grandinette, Esq.**

39.    Dr. Berill points out earlier letters written by Lloyd Simon, MD dated 2/28/03 and 11/14/02 reflecting his diagnosis of Mr. Corwin with Chronic Fatigue Syndrome; and Dr. Simon's references to prior letters dated 5/20/98, 9/3/99 and 1/14/02 – with records signed, authorized and

---

[13] https://www.reddit.com/r/cfs/comments/7rcep1/advice_for_other_cfs_sufferers/
[14] https://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/symptoms-causes/syc-20360490#:~:text=Chronic%20fatigue%20syndrome%20(CFS)%20is,doesn't%20improve%20with%20rest.
[15] https://pubmed.ncbi.nlm.nih.gov/33401106/
[16] https://www.reddit.com/r/cfs/comments/rwpydn/my_suffering/

including diagnosis of CFS; medical history describing David's sudden onset of Chronic Fatigue Syndrome in March of 1983; and references made to him visiting the Lahey Clinic in Boston at the time (11/26/84) – with Hartford and other medical insurers also reaffirming the diagnosis of CFS. Dr. Simon had noted for Hartford Insurance staff and attorney inquiries that:

"My diagnosis remains chronic fatigue syndrome. In the nearly 10 years I have been caring for Mr. Corwin, nothing to date has made me change my mind or question that diagnosis. In addition, no significant changes in his symptoms have occurred that would suggest another illness. It is my belief that it is fruitless to continue to pursue multiple evaluations and testing for Mr. Corwin. As his physician, my responsibility is to Mr. Corwin and help him deal with his disease, not continue in an unending quest to find some other elusive diagnosis that most likely does not exist." *See* Exhibit F.

40.     Mr. Corwin's social security administration records note an independent medical exam by Dr. Harry Kousourou, Diplomat, American Board of Internal Medicine (8/29/94) stating:

"The claimant is a 46-year-old male with an 11-year history of CFS beginning approximately in March of 1983 when he developed pharyngitis associated with severe fatigue." ... "multiple complaints including photosensitivity, sleep disturbance, early morning wakening, difficulty falling asleep, irritable bowel symptoms, myalgia and persistent fatigue" ... "He has had rather extensive work up including tests for thyroid and Lyme disease, apparently all negative. He had consulted with an infectious disease specialist, Dr. A. Klein at one time as part of his work up." [5/15/89]  *See* Exhibit D, at Exhibit C.

41.     Records dated 8/15/94 for Dr. A. Wolpert's NY State Dept of Social Services independent medical examination of Mr. Corwin notes reported diagnosis of CFS with "multiple medical evaluations" over 11 years at that point. Mr. Corwin was treated with Doxipan, Valium and Amitriptyline over that period of time. Dr. Wolpert's assessment also makes references to both Dr. Simon and Dr. Klein's specific reporting to date. *See* Exhibit D, at Exhibit E.

42.     **a)** Letter to Mr. Corwin 8/21/96 from PBA Inc. on behalf of Hartford Insurance Company scheduling and interview and independent medical exam to determine physical

condition and level of disability with regards to reported CFS. **b)** PBA Inc. letter to Mr. Corwin 11/27/96 (after conducting the interview and exam w/Dr. Carl Freeman) noting David was determined to be completely disabled and unable as a result to hold any type of job/employment. **c)** 11/7/02 letter to David from Hartford Life Insurance confirming his long-term benefits status. *See* Exhibit D, at Exhibits F and G.

43.     As we've noted to USPOs and the AUSA's office, we've been frustrated by our inability to obtain more of these medical records, due to their age and physicians having retired, changed practices, etc. What we have gathered (and reinforced), however, is that records and documentation at hand now unquestionably verify Mr. Corwin's CFS. It has been a debilitating, long term, ongoing illness for him elusive of any real cure. Overall, the medical history and prognosis is not good.

44.     Dr. Berrill points out that a CFS diagnosis can sometimes be controversial, and "often overlooked or minimized by physicians." Mr. Corwin's condition for CFS is now monitored by Dr. Hess and his tremors are monitored by Dr. Norman Pflaster through South Shore Neurologic Associates PC in Patchogue NY. Neurological consultations also reference CFS pioneer Dr. Paul Cheney,[17] and additionally current treating physician Dr. Hess (who unfortunately did not initially respond to EDNY USPOs as noted in the PSR).

45.     Dr. Berrill's diagnostic impressions note Mr. Corwin's insight and judgment are viewed in several respects as quite poor, stating: "it is clear that Mr. Corwin has suffered from chronic anxiety, mild depression and substance abuse for most of his adult life." Regarding added points to consider that are pertinent, Dr. Berrill comments further from his report:

*"Mr. Corwin unequivocally reported that he does not believe that adults should have sex with children, stating, "It's never acceptable." Further, he stated that there were times when he*

---

[17] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6438100/

*obtained child pornography that he found extremely upsetting, reporting that he understands that the photographs and video clips of children being sexually abused by adults reflected terribly "destructive" behavior on the part of the adults toward the children depicted in this material." See* Exhibit B, at p 8.

*"Mr. Corwin demonstrates an understanding that his involvement with pornography was entirely compulsive and relied upon, in many respects, to avoid social interaction with others and confront lifelong symptoms related to anxiety and depression."*

*"When Mr. Corwin began experiencing symptoms related to chronic fatigue syndrome, he was gainfully employed and active in his community. As he withdrew from work and his involvement in civic activities, he became increasingly isolated and cut off from regular social involvement with others." Id.,* p. 18.

*"Mr. Corwin does not impress as someone who poses a threat to the community - that is to say, he is not a predatory individual, however, it is clear that he cannot return to the compulsive viewing of pornography." Id.,* p. 19.

46.     During almost an entire lifetime David has never had or maintained relationships (intimate or otherwise). His rare sexual contact over time with a girlfriend many years ago left him confused and further isolated while just in his twenties. He's experienced no social life or interactions all these many years. David also feels that his long history of anxiety and fatigue since the arrest have worsened in all the panic, especially the personally frightening reality of being extracted from the years of isolation in his secluded home into the unknown confines of an uncaring and unforgiving federal prison/camp. He prays for a minimal period in federal prison and for therapy to finally somehow overcome these issues, and have time left in life to repair it all - but the harsh reality of charge and conviction looms heavy with bleak expectation.

**First Light Psychological Services, P.L.L.C. Farmingdale N.Y. / Interview Date 4/8/21 / Director Theresa DeSantis, Ph.D. / Report Date 4/21/21**

47.     David Corwin is being treated through Dr. DeSantis' office, First Light Psychological Services, P.L.L.C., on a Pretrial basis and has been in therapy there since shortly

after his arrest (April 2021). Dr. DeSantis' report dated April 21, 2021, characterizes David as a 73-year-old single male with average intelligence who ***does not have any support system available to him***. *See* Exhibit C at p 11. Files note a reported medical history of Chronic Fatigue Syndrome first diagnosed in 1983. Also noting Mr. Corwin has not participated in medical exams in several years and does not currently take prescribed medication. With his judgment and insight portrayed as lacking substantively, while also stating:

*"Mr. Corwin was forthcoming with his admission to engaging in viewing child pornography for many years." ... "He takes responsibility for these behaviors and expressed embarrassment and humiliation." ... "Mr. Corwin's objective findings on the Abel Assessment for Sexual Interest demonstrated that his primary sexual interest is in adolescent females 14 to 17 years of age." See* Exhibit C at p 9. The "danger registry" indicates that Mr. Corwin shows no intent to personally engage in sexual acts with minors. At page 10 of Dr. DeSantis' evaluation, she concludes that *"Mr. Corwin's results demonstrate that there are no concerns present."*[18]

*"Mr. Corwin's score on the Cognitive Distortion scale was **non-problematic (4%)**, indicating that he did not endorse items that reflect types of rationalizations and/or excuses used frequently by individuals who are sexually involved with or attracted to minors." Id.,* p 9.

*"active clinical syndrome of Major Depression (recurrent, severe) and Generalized Anxiety Disorder." ... "met criteria for Major Depression (recurrent, severe) and Generalized Anxiety Disorder." Id.,* p 7.

48.    **Psychopathy and Potential Danger to Community:** Significantly, Dr. DeSantis' concluded in this portion of her report that Mr. Corwin's total row score of 11 suggests that *"he does not possess psychopathic features and is not a violent threat to the community." Id.,* at p 12

---

[18] The statement "no concerns present" is specifically referencing the fact that Mr. Corwin does not present a public danger of acting out on a sexual fantasy.

49.     However, Dr. DeSantis continues and offers a problematic and shortsighted statement with regards to Chronic Fatigue Syndrome, saying:

> *"Of note is that Mr. Corwin's claim to have Chronic Fatigue Syndrome since 1983 is questionable. The disorder itself has faced controversy over the years of whether it is medical versus psychosomatic in some individuals. Mr. Corwin's case it is believed to be the later and he tends to use this condition as an excuse for many dysfunctional aspects of his day-to-day life, including why he "got caught" with child pornography. Chronic Fatigue Syndrome as a true medical diagnosis is more than feeling tired all the time. There are other symptoms that make it very difficult for a person to carry out simple tasks in everyday life."[19] Id., p 13.*

50.     Dr. DeSantis having interviewed Mr. Corwin once, simply 'believes' David's CFS is psychosomatic, and therefore untrue, offering nothing to directly dispute it other than mere speculation. Respectfully, this comment in Dr. DeSantis' report is irresponsible and also goes against the grain of diverse and learned diagnosis over a period of many years.   Contrary to established criteria and developed recidivist data observation, Dr. DeSantis pessimistically (and without tangibly supportive references) also states:

> *"Given the overall results of this examination, at this juncture, Mr. Corwin is at **high risk of reoffending**. It his hopeful this risk level will become reduced once he remains abstinent from illicit drugs and demonstrates sincere motivation to successfully complete sex offender treatment during his years of probation or supervised release." Id., p 13.*

51.     Thankfully Dr. DeSantis did not mention that prison time would assist in lowering any recidivist concerns in a case like Mr. Corwin's - which by all accounts (and data assessment) demonstrates otherwise.[20] With regards to similar instances (which prompted Dr. DeSantis based PSR objections), Mr. Corwin reported at times when he would give marijuana away it was strictly

---

[19] Note that Dr. DeSantis has no professional training in the medical field, and respectfully, should defer to medical professionals best trained, and therefore qualified, to comment on CFS.

[20] https://pubmed.ncbi.nlm.nih.gov/29592774/ A Validation Study of the Child Pornography Offender Risk Tool (National Library of Medicine, June 2019).

to adult male acquaintances, yet somehow this was inaccurately depicted by Dr. DeSantis as having distributed marijuana to minors.[21] With all due respect to DeSantis, this initial psychological reporting unfortunately (and transparently) lacks a credibility as to her conclusions concerning CFS, that a more in-depth period of time and approach could have produced - and stands at odds with the more learned/detailed consensus (and reality) developed elsewhere in the reporting through Dr. Berrill, both earlier and present physicians cited, and also thankfully the efforts of USPOs to better understand the situation.

52.     The DeSantis report however is forced to recognize some sad realities here as well, even while trying to lean away from a Chronic Fatigue Syndrome concurrence (that only flies in the face of medical community and insurance company consensus prevalent elsewhere). This report's take on its recidivism assessment is additionally at odds with the established research and data present/available to date - *and to the contrary Mr. Corwin presents as extremely low risk*.

53.     My detailed recent correspondence to EDNY USPOs (Officer Gregory Giblin) [*letter dated 6/21/22*] closely reviewed the conclusions of Dr. DeSantis and Dr. Berrill which were strikingly similar in their diagnostic impressions of Mr. Corwin and both recommend that Mr. Corwin engage in mental health and sexual offender treatment including individual and group therapy. *See* Exhibit G at pp 2-6.

54.     Notably, and perhaps most significantly from a sentencing perspective, both Dr. DeSantis and Dr. Berrill concur that David Corwin does *not* pose a danger to the community. Dr. DeSantis' concluding that Mr. Corwin *"...does not possess psychopathic features and is not a violent threat to the community."* See Exhibit C at p 12. Dr. Berrill concluded that "*Mr. Corwin does not impress as someone who poses a threat to the community—that is to say, he is not a*

---

[21] Given the length and scope of the exam, coupled with the extensive note taking, which was later reduced to a written report, it is certainly understandable that a factual error could have occurred during this process. Mr. Corwin vehemently denies ever giving marijuana to a minor.

*predatory individual, however, it is clear that he cannot return to the compulsive viewing of pornography." See* Exhibit B at p 19.

55.     Accordingly, two highly respected and qualified psychologists in the field have concluded that Mr. Corwin is not a danger to the community. In addition, both experts conclude that 1) Mr. Corwin has never engaged in therapy prior to his arrest and 2) that Mr. Corwin will need to participate in a sex offender treatment program that encompasses individual and group treatment.

56.     It is worth noting, that since Mr. Corwin's release on bail in April of 2021, he has had access to the internet and has proven that he can, and has in fact, abstained from the viewing any pornography. Moreover, any relapse would amount to a return to the computer, which is now and will continue to be monitored post sentencing. In the event Mr. Corwin did in fact relapse, he would face swift and harsh consequences, including additional years in jail and the likelihood of facing new criminal charges.

### *Issues of Substance Abuse are Prevalent and Significant*

57.     Mr. Corwin was 21 years old when starting to use marijuana (now and then) and since early 1983 he has used it daily. He grew it in his home to minimize costs of the habit. He gave away some to friends (and those who helped him around the house or outside with chores). Mr. Corwin has used non-prescribed valium for twenty-five years (an approximate average of 5mg daily). Since the arrest for this offense, he has successfully stopped his valium and marijuana use as verified by independent drug testing.

58.     David has relied on valium and marijuana all these years as a balance to his experiences of 'social ineptness." The valium leveled things out and is noted as providing an energy level for him to overcome the awkwardness in interactions with others. It worked for him by his own admission in handling the necessary basics. But he has not used valium since initially

entering pre-trial regarding this case, and it took a moment for him early on to put the brakes on this after such a long period. He has curbed the marijuana use as well. There has been no other illicit drug use involved - and of note Mr. Corwin does not consume alcohol.

59.     For the record: there was some Benzodiazepines used beginning at age 45 and last used in 2021. There was some cocaine use beginning at age 35 and last used in 1981. In terms of family history with substance abuse, Mr. Corwin's entire family have had serious problems with alcohol, including his father, mother and brother. David *never entered therapy* in any form to deal directly with this verbal and psychological abuse suffered during childhood. He is forthright in expressing strongly how negative an impact this upbringing and abuse had on him - *the sustained barrage of insults and verbal assault from his father left him anxious and damaged his entire life*.

60.     Early physician contact for chronic fatigue syndrome (noted in reports) brought valium into his purview (along w/Doxipan and Amitriptyline). Mr. Corwin has reliably explained that he did not understand he had social anxiety at the time until he began taking the valium twenty-five years ago. In reports he states "[it] gives me an up feeling" and 'confidence when he had to engage in social interactions or meetings.' He also experienced the valium as helping with the Chronic Fatigue Syndrome by giving him an enabling energy to keep up with daily obligations.

61.     Of note - although having issues with valium, Dr. DeSantis mistakenly[22] states that chronic tremors presently afflicting Mr. Corwin are drug withdrawal or detox related and discounts the severe tremors that were noted. As a result of Dr. DeSantis' belief, David was immediately directed by pre-trial services to report to the emergency room for detoxification. However, Mr.

---

[22] Dr. DeSantis made this determination after spending 3 hours with Mr. Corwin on April 13, 2021, during which time Mr. Corwin admitted to the daily use of 5 mg of valium over the course of years. Dr. DeSantis also physically observed David's tremors. One could understand drawing a reasonable inference, albeit erroneous, that the tremors were connected to valium withdrawal. Although a highly respected professional in her field, Dr. DeSantis is not a Neurologist, and it appears she made a reasonable, yet erroneous conclusion regarding Mr. Corwin's tremors which are clearly a medical condition.

Corwin was not admitted to the hospital because he did not meet the medical criteria for valium detoxification. David has explained that stopping valium use after all those years was challenging, but credits participation in therapy and Alcoholic Anonymous for his ability to overcome his valium dependency. Weaning himself off valium took focus no doubt, but *the tremors seem more likely reflective of a larger neurologic condition as diagnosed by South Shore Neurological Associates.*

62.   Dr. DeSantis further states regarding Mr. Corwin: "*it is believed that he is underreporting the actual amount of valium he has been abusing over the years.*" What that's based on (like some of the other assertions unsoundly made) remains unclear. Mr. Corwin has been extremely forthcoming in great detail with all things (by all other accounts).

63.   It is a detailed web and chronology as revealed to all by Mr. Corwin (ashamed but honest). Given all that is to process and comprehend here, it does not appear he left much of anything out in his honest portrayal of events. And even should he somehow had ingested a bit more valium over time than admitting (or recalling) what is the relevance or point of that in the totality of things (especially were it not true)?

64.   Dr. Berrill's report however importantly notes the following with regards Mr. Corwin moving forward, trying to maintain good focus ahead, and the reality of that challenge:

"With respect to substance abuse, he indicated that it was suggested to him that attending Alcoholics Anonymous and Sex Addicts Anonymous could help him with both his substance abuse and habitual pornographic viewing problems, even though he did not have a problem with alcohol. Mr. Corwin reported that he began attending both programs online and secured sponsors in both Alcoholics Anonymous[23] and Sex Addicts Anonymous. He indicated that he

---

[23] Although Mr. Corwin is not an alcoholic, it was suggested he attend AA and not Narcotics Anonymous based upon the believe that he would have greater identification with the majority of individuals in AA. Both programs focus on a 12-step recovery program, however, the demographics of NA include a much younger membership. Mr. Corwin was directed to substitute the words marijuana and valium in place of alcohol when applying the principles of the AA program. The point is that Mr. Corwin is no longer denying his issues, and for the first time in his life has begun to reveal his secrets to the world and seek help.

23

has found both programs very beneficial. He attends SAA and AA almost seven days a week and stated that he does not feel as isolated or alone knowing other people have similar issues." *See* Exhibit B at p 10.

"Despite Mr. Corwin's chronic anxiety and depression, as well as his compulsive viewing of pornography, he never pushed himself to pursue mental health treatment. As such, he has led a lonely, unhappy and socially dysfunctional existence for most of his adult life." *Id.,* p 19.

### C.   Letters of Support on Behalf of David Corwin[24]

65.    Letters submitted by those who have known David portray a conscientious man with a deep and sincere caring for his community and hometown. A colleague on the Greenport Zoning Board with David since 2014 states that although not close friends with him:

"I always had the greatest respect for David and his judgment. He comes from a family with deep roots in North Fork history... He has always been an active citizen... I do not pretend to understand what led David to commit this dreadful crime. I have never seen any cruel or prurient qualities in him... Of course, his arrest has generated lots of talk in this small town, but I have never heard anyone say that this conduct was something expected from him... I cannot imagine that lengthy incarceration of this elderly engineer will benefit society either as incapacitation or deterrence. And I know that someone who is somewhat fragile and solitary is not likely to adapt well to prison." *Diana R. Gordon / Greenport Zoning Board of Appeals*

66.    A decade long tenant of Mr. Corwin's rental properties states to the Court:

"During the 11 years that I have known Mr. Corwin I've only experienced a kind and polite landlord and neighbor. Mr. Corwin has displayed compassion and understanding in terms of rental payments and has been both timely and responsive with any property management issues ... I believe that Mr. Corwin is capable and worthy of redemption and rehabilitation ... I do not believe the interests of justice, or the community are best served by incarcerating Mr. Corwin for the rest of his life... I believe that Mr. Corwin has made a sincere

---

[24] Letters of support written to the Court on behalf of David Corwin are included at Exhibit H.

commitment to maintaining continued treatment and will be successful in that." *Ryan Beckley / Rental Tenant of Mr. Corwin for 11 Years*

67.     David's sponsor for sex addiction issues notes the following for Your Honor:

"For the courts on behalf of David Corwin or as we call him David S in our anonymous Sex Addicts Anonymous [sic] meetings. He attends regular, completed his step work with me as his sponsor for over a year now. He confessed to his porn attraction to underage porn during his 1st step, which is usually the hard part of working with porn addicts. He has been able to maintain sobriety, while we never know who may re-offend. I have worked with him over a year. I truly believe he is safe and not a threat [sic] to society or I wouldn't sign this letter." *William Spencer MECA-SAA Mercy River Recovery Church*

68.     A very longtime friend, acquaintance and colleague of David also says to the Court:

"I have known David for 50 years. We have worked together. David was one of the hardest working people I knew. Whatever he's suffering from made it impossible to work any longer. I've watched him deteriorate from a strong hard-working individual to wither away to the physical state he is in now. When I first heard the charges against Mr. Corwin I was shocked ... in bed day after day with no contact with the outside world. This is not the David Corwin I know... He has followed all suggestions to remediate his mistakes ... I do not believe he will ever be in front of a court again. Your Honor, I implore you to be lenient and compassionate ... His health is compromised and I do believe it was the disease that clouded his judgment. He is a 74-year-old man in poor health who has done everything the Court has asked him to do." *Thomas Crowley / Five Decades Knowing David Corwin*

69.     A friend since childhood shares the following with the Court regarding David:

"Our friendship started with our mothers. My mother was a nurse in Greenport for over 40 years and Mr. Corwin's mother was also a nurse in Greenport hospital as well for many years. Mr. Corwin has dedicated many years to the planning departments and operation of the Village of Greenport while attempting to make the village run more efficiently. I commend him for his unwavering honest commitment in maintaining his principles and reliability in the donation of his time to the village. I have never known of Mr. Corwin to vary in his principles and reliability in assisting the village's government. At one time in

my life Mr. Corwin convinced me to participate in the betterment of Greenport and I did so with his advice by running for Village Trustee which progressed to being Deputy Mayor for six consecutive years and three administrations. I relied on Mr. Corwin's opinion on multiple occasions in order to eliminate political mistakes and remain as devoted to the village as he was. I would like to ask that leniency be administered in Mr. Corwin's sentencing. I would never imagine that he would deviate into something illegal. *I admire all the good of which there is plenty which is exemplified by his dedication to the Village of Greenport government*. *John A. Costello / Friend, Acquaintance and Colleague of David Corwin for 70 Years*

70.     And another longtime tenant of Mr. Corwin writes to Your Honor expressing the absolutely unique level of kindness and generosity one finds with David consistently (and far beyond the usual to be expected in most situations), stating to the Court:

"Mr. Corwin has always been fair and compassionate. He works very hard. Unfortunately, the past several years his health has declined. During this time, I have noticed he works for short periods of time and stops to rest or nap. Mr. Corwin has always been fair and lenient with my rent. I work in the hospitality business and my income fluctuates throughout the year. Mr. Corwin has been very understanding when I pay rent late. I went through a rough patch a few years ago and didn't have a job. I got behind on rent for several months. Mr. Corwin helped me get rental assistance and forgave me for some of my owed back rent. When the pandemic happened, he also decreased my rent to help with the situation. I was shocked when I heard the charges against Mr. Corwin. *Having lived next door to him for 17 years I've never seen or felt like he would do anything to harm anyone*. The charges against him don't fit the person I've known for 17 years. With this in mind I hope that you'll be lenient with Mr. Corwin in his sentencing." *Lisa Johnson / Tenant-Neighbor for 17 Years*

71.     Leslie Christensen, David Corwin's first cousin, reflects on David's kindness and generosity over the years, stating to the Court:

"David has always been there for members of the family. For example, while all the children in the family inherited a beach property on the found from our grandmother, David is the one that kept up paying the property taxes on it for decades without ever

asking any of us for money. He supported his cousin Charlie, by making property tax payments on his house for years. At one point he helped a homeless man by allowing him to stay in his garage until the man became destructive of the property. The charges against him are significant deviation of his normal character. While at one point he was not aware of the harm that this kind of activity had on the children involved, he is keenly aware of it now. Based on our discussions, I know he would never get involved with this again. I am writing to ask you to offer leniency and compassion in handling. He has for years been plagued with chronic fatigue syndrome. Most of the time that I reach out to him, he is having bad spell and in bed. Federal prison will be an exceptional hardship, and I am concerned it will cause him severe physical and emotional harm given his condition."
*Leslie Christensen / First Cousin*

**D.        Offense Related Overview**

72.        On 3/7/22 David Corwin plead guilty to Your Honor. The PSR (beginning at p3, par 3) details the offense particulars thoroughly (as do the psychiatric reports). At both the time of arrest and during subsequent interviews Mr. Corwin was (and has been) throughout extremely cooperative, honest and frank with law enforcement authorities. ***Of important note given the overall picture in this sad history and present circumstance, an indictment for 'possession' rather than 'receipt' may have seemed reasonably appropriate (and more humane) given the mitigating factors unique to Mr. Corwin's background and offense situation.***

73.        From the EDNY USPOs' sentencing recommendation to the Court: "*Notably the defendant is subject to a mandatory statutory custodied term of 60 months. **The Probation Department notes the difficult set of circumstances in sentencing the defendant in this case.** This 74-year-old defendant has led an otherwise law-abiding life, and we believe some consideration should be given for his age.*" And it rightly adds: "*Despite the troubling conduct, we believe that some consideration should be given for the defendant's difficult childhood.*"

27

74.     The EDNY USPO sentencing recommendation and PSR (p26, par 103) note *U.S. v Dorvee*, 616 F.3d 174 (2nd Cir 2010) and application of USSG § 2G2.2 in terms of 'fundamental difference' and specific offense characteristics in the majority of cases, and 'undue weight given to some of the provisions' - distinguishing case circumstance that differs and with 'great care avoiding unreasonable sentences' inconsistent with 3553a factors in their totality -  with PSR noting "this may be a mitigating factor for the Court at sentencing."

75.     The length of time of the offense conduct, notably shows that not once were these types of things ever acted upon - and beyond reliably can easily be viewed as never would have been. If Mr. Corwin was going to act out, rather than merely view pornography, surely, he would have done so at some point over the more than twenty-year period in question. The materials possessed and their volume in numbers is not brushed aside, is admittedly awful, but with only computer screens and alone in his home day after day for so many years, David did not come out for much of anything.

76.     Mr. Corwin is 74 years of age and clearly suffering in his mental and physical health. There has been no indication, or even suspicion, that he acted out or had any intentions to - quite the contrary. A collection of materials yes, but never an attempted contact anywhere. His offense is a sad and lonely one and with great cost now unfortunately to himself - and with a real appreciation now of the damage to victims his own reclusive sad circumstance produced, which he never fully comprehended during his long periods of isolation.

77.     On June 10, 2021, a respectful request was submitted to the AUSA regarding the understanding that Mr. Corwin would have to do prison time but proposing the Rule 11(1)(c)(1) plea to 'possession' and an accompanying 18-month sentence would better reflect the totality of the circumstances. On August 9, 2021, the AUSA's office informed me that the Rule 11 plea request would not be considered, and unfortunately, in part, due to some of the notations in Dr.

DeSantis' initial assessment and the belief that David was not completely candid with Dr. DeSantis at his initial appointment.

78.     The belief that Mr. Corwin was in any way not candid is absolutely inaccurate. I think it is noteworthy that Dr. DeSantis' report was an initial report, after meeting with Mr. Corwin on one occasion, within several weeks of his arrest.  I am sure we can all agree that Mr. Corwin was shell shocked, frightened and riddled with anxiety when asked to sit down and disclose to a complete stranger the most intimate, embarrassing and shameful details of his entire life. Frankly, I thought his candor was much greater than one might expect under the circumstances- from longtime isolation to sitting with a stranger discussing shameful details of his entire life - and in keeping with our collective experiences given the disclosed content within the report. Moreover, given the nature of the creation of the report itself, e.g., a one-time meeting between strangers spanning hours, covering decades of materials, which are reduced to notes and then generated into a report, by its very nature, can lead to honest mistakes or inaccuracies. DeSantis herself did not accuse Mr. Corwin of being deceitful. The deep well of candid materials provided First Light in therapy since April of 2021- and as seen with Dr. Berrill's lengthy assessments - while also noted in PSR offense/background descriptions, and seemingly as concluded by all to date; the background and circumstance here all clear in great unfortunate detail, appear direct and candid. The issue to be decided now, remains ***the length of a prison term, which ideally is done through a focus on rehabilitation and not retribution***.

### E.     Life Since the Arrest

79.     David is currently in a mental health treatment program for the very first time, and long overdue (weekly psychotherapy at First Light Psychological Services). He is involved in ongoing sex offender treatment (attending Zoom meetings regularly) and has enrolled with AA for the initial discipline needed to resist and correct his valium and marijuana issue. His valium and

marijuana addiction was severe to say the least. He has not taken valium or marijuana since April of 2021. He also has not viewed pornography in any form since his arrest. David has made very good progress initially with rehabilitative efforts post-arrest - a real milestone both worthy of note and hope for the future.

80.       Since his arrest, David has worn an ankle bracelet. Pre-trial supervision (outside of the valium issue and storage devices early on) has been very satisfactory and without any concern or incident. Drug testing since April 22, 2021, have all been negative.[25] His pre-trial behavior and compliance in all things required has been a priority for him each day. He is presently under conditions of home confinement. The Court has kindly permitted him to use a tablet with internet access which he uses to attend online Sex and Alcoholics Anonymous meetings and conduct his banking.

81.       There has been virtually no communication with his brother Kirby since April 2021. After the arrest Kirby was insulting and very harsh in commentary toward David (reminiscent of the abuse at home from their father given the terribly derogatory tone). It was not supportive by any means. This tension is highlighted in Kirby's sentencing letter submitted on David's behalf. *See* Exhibit H. It is devoid of any reference of a singular positive character trait attributable to David, other than the statement that "...I doubt very much David would ever again be involved in the criminal justice system." Rather, Kirby Corwin's letter only asks for leniency in David's sentence.[26] Sadly, Kirby Corwin's letter speaks volumes about, and corroborates the reality of David's upbringing. There are many issues these two likely have to deal with themselves.

---

[25] The Defense acknowledges the memorandum of Amanda Sanchez dated September 20, 2022, submitted to Your Honor entitled, "Notification of Positive Drug Test" indicating a positive test result for codeine following an August 18, 2022, drug test. Mr. Corwin denies he knowingly ingested any form of codeine—over the counter or otherwise. In sixteen months of testing, this is the only positive test result for non-prescribed medication.

[26] Kirby Corwin opines that a 5 year sentence "...could be a death sentence for David given his age and health." See Exhibit H.

Sometimes it's an overwhelming catalyst that motivates such (like this moment for David). Maybe Kirby will come back around. Maybe these two can finally work it out and find some closure for one another.

82.     David has been engaged in weekly therapy with First Light (since April 2021). *See* Exhibit I Monthly Treatment Reports. Notably, it is a long road ahead for David to sort through 72 years of dysfunction, but a start has been made.

83.     It is a long drive back and forth from home to sessions at First Light (3hrs), which is located in Farmingdale, which takes a physical toll on David, but he pushes forward knowing it is a good direction. His meetings and participation in Sex Addicts Anonymous helps him delve into all the reasons to better understand his behavior and correct it. Thankfully David has found this to be very helpful and beneficial. *Since January of this year, he's been prescribed Clonazepam for his anxiety, which has really helped. David utilizes the Clonazepam just prior to social situations with great benefit*. The prescription was issued by current treating physician Dr. Hess on January 3, 2022.

84.     Going forward, David will need to be compliant with NYS Sex Offense Registry requirements (outlined in detail at PSR p 25, par 97-100). Mr. Corwin fully intends to comply with all that is expected of him regarding NYS registry matters. Regarding '*Collateral Consequences from Felony Conviction*' (PSR p 26, par 101) the denial of government benefits is noted among other points of consequence. *David worries over how this will affect his Social Security payments, which will in fact be suspended during his period of incarceration (yet reinstated when he's released from custody).*

85.     There are still many moments of difficulty however in meeting his present obligations given Chronic Fatigue Syndrome's significant and remaining effects and challenges. But David tries hard each day. The PSR (p16, par 57) notes comment from *First Light* staff saying

he "*was recently described by his therapist as utilizing therapy well, despite minimal supports*.'
It is a sad overall aspect here that this lone man walks uphill heavily burdened and with the
daunting prospect of jail and many challenges that lie ahead.

      86.     The Abel Assessment screening conducted demonstrates Mr. Corwin showing no
intent to ever actually engage in sex acts with minors. As noted prior, he's been a recluse, hardly
ever leaving the house or in any setting where he could be any threat to public safety. Even Dr.
DeSantis' evaluation of testing data (at p.10) concludes "*Mr. Corwin's results demonstrate that
there are no concerns present*." First Light Psychological Services recent monthly reports note
David is very anxious and fearful of his upcoming sentencing.

### F.    Plea and PSR

      87.    Specific matters of plea, statute and guidelines are reviewed in detail at the
introduction of this memorandum. The conviction and plea recognize Mr. Corwin's right to ask
the Court for a sentencing variance. The U.S. Probation Office (as noted in its PSR) encouraged a
sentence outside the guidelines based on Mr. Corwin's personal background and circumstance, the
full context of his actions within offense behavior, his genuine remorse, regret, and acceptance of
responsibility - and his own dire need for treatment and counseling coming out of this. The five-
year statutory minimum for the 'receipt' conviction is presently contemplated (and not the Rule
11 based 'possession' conviction reflecting an 18-month period of incarceration). And I must defer
again to USPOs and the PSR who so accurately observed: "*The Probation Department notes the
difficult set of circumstances in sentencing the defendant in this case*." Resoundingly true.

### DISCUSSION

### V.    The 18 U.S.C. § 3553(a) Factors Support a Downward Variance

      88.    Although the Sentencing Guidelines are the starting point for the calculation of an
appropriate sentence, a district court "may not presume that the Guidelines range is reasonable."

*Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, the court "must make an individualized assessment based on the facts" of each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing. *Id.*; *Kimbrough*, 552 U.S. at 91. **If the Guidelines calculation in a given case results in an "inordinate emphasis" on "putatively measurable quantities," a court may focus more on the statutory factors set forth in 18 U.S.C. § 3553(a) to determine an appropriate sentence.** *United States v. Adelson*, 441 F. Supp. 2d 506, 509–12 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). The Supreme Court has held that extraordinary circumstances are *not* necessary to justify a sentence outside of the Guidelines' range. *Gall*, 552 U.S. at 47.

89.     Accordingly, after calculating the proper offense level under the Guidelines, the district court must consider each of the § 3553(a) factors and "tailor the sentence" to fit the circumstances of the case. *United States v. Booker*, 543 U.S. 220, 245 (2005). A court "exercise[s] a wide discretion in the types of evidence [it] may consider" when choosing an appropriate sentence to ensure it is in "possession of the fullest information possible." *Pepper v. United States*, 562 U.S. 476, 480 (2011) (internal quotation marks omitted).

90.     The application of the § 3553(a) factors to this case strongly supports a substantial downward variance from the advisory Guidelines offense level. Here, a lenient sentence for all the factors encompassing the totality of this sad circumstance, should the Court deem appropriate, would be sufficient, but not greater than necessary, to satisfy the purposes set forth in § 3553(a).

A.     **The Nature of the Offense and History and Characteristics of the Defendant**

1.     **Nature of the Offense**

91.     In selecting a sentence, a Court must consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Mr. Corwin admits that he committed serious crimes and accepts responsibility for his wrongdoing. This section/memorandum is not meant to excuse his conduct.

33

92.     Nevertheless, the "nature and circumstances of the offense" in this case suggest that an appropriate sentence is well below the advisory Guidelines range. When thinking of committing a man to prison who has had so much personal difficulty over so many years, who has so infrequently left his home over the past two decades as to not pose an immediate threat to any community, and after all these years of isolation is himself extremely vulnerable to a prison environment (given such lack of social contact and ability for so long) - even in light of the gravity of the offense, the period of incarceration should not be disproportionate (or blind) to the myriad of mitigating issues here.

### 2.     History and Characteristics of the Defendant

93.     Mr. Corwin's "history and characteristics" weigh in favor of a non-Guidelines sentence. ***"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance***." *Adelson*, 441 F. Supp. 2d at 513–14. Mr. Corwin is, by all accounts, a sympathetic and unique case consideration. And I again offer (and agree with) the USPOs' notation within its sentencing recommendation: "*The Probation Department notes the difficult set of circumstances in sentencing the defendant in this case.*"

### C.     The Purposes of Sentencing

94.     Each sentence imposed should also reflect the four purposes of sentencing set out in 18 U.S.C. § 3553(a)(2):

  (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B)     to afford adequate deterrence to criminal conduct;
  (C)     to protect the public from further crimes of the defendant; and
  (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

95.     The statute explicitly instructs that the sentence should be "sufficient, *but not greater than necessary*," to comply with these four purposes. 18 U.S.C. § 3553(a) (emphasis added).

96.     A cruel and lengthy sentence of imprisonment is not necessary in this case "to reflect the seriousness of the offense," "to promote respect for the law," or "to provide just punishment." *Id.* Mr. Corwin understands he has plead guilty to a serious crime and that this Court must impose a sentence that reflects the seriousness. But truly fostering rehabilitative goals sought here are negated with any lengthy incarceration - rehabilitative goals better served, achieved and effectuated <u>through a more lenient/understanding sentencing option empathetic to the sad nature of these offense particulars (which sets it apart on several levels from the more typically situated offender with this charge and conviction)</u>. And on a more practical level, the cost efficiency of avoiding unnecessary expenditures on prolonged incarcerations if not truly required, or greater than necessary to achieve a fair and reasonable punishment, is also prudent to note. *See* PSR p 25 par 1.

97.     Finally, a harsh or too lengthy term of imprisonment here is not required to "protect the public from further crimes" - nor will David find a federal corrections environment capable of providing him with the "needed educational/vocational training, medical care, or other correctional treatment" that he truly/desperately needs. <u>The shortest sentence possible allowing him to return to meaningful counseling that he's finally begun is critical</u> - the level of which he will not find in the BOP during a stay there - and assuming he is able to cope/endure for the duration.

### D.    The Kinds of Sentences Available

98.     The Court has discretion to consider a wide range of alternatives to suggested advisory Guidelines. <u>In this unique case, a compassionately based and humane resolution would better satisfy the goals of both community and individual betterment</u>. With specific regards to Court discretion and relevant considerations, the Court retains the legal authority to sentence Mr.

Corwin as 'it' deems appropriate. And in essence the issue becomes what end(s) of justice are served by sentencing David Corwin to a long term of imprisonment, as opposed to an honestly (documented and reasonable) more sympathetic alternative judgment given the sadly unique totality of this?  Or even whether any period of incarceration is greater than necessary to address truly relevant considerations in circumstances like these? *See* ABA Standards on Criminal Justice, Sentencing 18-6.1(a), p. 219 (3rd ed. 1994) ("The sentence imposed should be no more severe than necessary to achieve the societal purposes for which it is authorized.").

99.    To the extent that rehabilitation is to be achieved through whatever sanction imposed, the law recognizes that imprisonment is not necessarily a proper vehicle to such an end. See *United States v. Anderson*, 15 F.3d 278, 282 (2d Cir. 1994) (discussing 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k)). Accordingly, in this case, a period of imprisonment, no matter how brief, would be nothing more than retribution for retribution's sake - a justification leading to a sentence greater than necessary in this case. *Cf.* 28 U.S.C. § 994(j) ("Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense")

100.    ABA Standards, Sentencing 18-6.4(a), p. 227 ("*A sentencing court should prefer sanctions not involving total confinement in the absence of affirmative reasons to the contrary.*"). A better, more just and humane course as a sentencing alternative to a longer period of incarceration here is a more lenient sentence and a meaningful fine with appropriate restitution.

### E.    The Sentencing Guidelines and Pertinent Policy Statements

101.    Although the Guidelines recommend that general deterrence be a primary consideration, the U.S.S.G. also encourages (for the types of reasons discussed here) that general

deterrence can also be accomplished (in a case like this) with a considerably below-Guidelines sentence <u>reflecting atypical offense circumstances and still meeting goals of a fair/just sentence</u>.

102.    This policy direction arose when the United States Sentencing Commission enacted amendments (Federal Register - 75 FR 27388, 5/14/10) explicitly designed to provide more alternatives to incarceration. The Chair of the Sentencing Commission explained, "<u>Expanding availability of alternatives to straight incarceration is a public safety issue. Providing flexibility in sentencing for certain low-level, non-violent offenders helps lower recidivism, is cost effective and protects the public.</u> This USSC action was an important step in the right direction."[27]

### F.    The Need To Avoid Unwarranted Disparities Among Similar Offenders

#### 1.    Similarly Situated Individuals Receive Sentences Below the Guidelines Minimum

103.    Federal sentencing data demonstrates that many Judges have recognized the advisory Guidelines can produce sentences of imprisonment that are significantly "greater than necessary" to achieve the purposes of sentencing - Supreme Court decision in *Kimbrough v. United States*, 552 U.S. 85 (2007).[28]

#### 2.    Similarly Situated Individuals Receive Fines Below or Within the Guidelines Range

104.    Guidelines identify factors to consider when determining amount of fine, including purposes of sentencing, restitution an individual is obligated to make, collateral consequences of conviction, and expected costs to government of imprisonment and supervised release.

---

[27] http://www.ussc.gov/news/press-releases-and-news-advisories/april-19-2010

[28] *Kimbrough v. United States*, 552 U.S. 85 (2007) confirmed that under *United States v. Booker*, 543 U.S. 220 (2005), federal district judges have discretion to impose sentences outside the Guidelines range in all cases.

### G.   The Need To Provide Restitution to Victims of the Offense

105.   As noted in the PSR at par 94: "Statutory Provisions: Since the instant offense occurred after April 24, 1996, restitution is mandatory pursuant to 18 U.S.C. § 3663A and Guideline 5E1.1(a)(1). Pursuant to 18 U.S.C. § 3664(d)(5), the Court may make a final determination of victims' losses not to exceed 90 days after sentencing." The second addendum to the Presentence report provides the list of victims and their individual claims provided to USPO by the USAO. As noted in my first request to adjourn Mr. Corwin's sentencing (DE 26), I am currently trying to resolve all of the restitution claims and will submit an addendum to the Defendant's presentence memorandum on the status of restitution prior to sentencing.

### H.   FINES

106.   The PSR at page 24 notes a statutory maximum fine of $250,000 - a mandatory $100 special assessment - and at pg 24, par 91 (defense concurring w/parameters) further states:

"The defendant is also subject to the provisions of the Justice for Victims of Trafficking Act of 2015. In addition to the assessment imposed under section 3013, the court shall assess an amount of $5,000, per count, on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324). 18 U.S.C. § 3014. The defendant is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. In addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess (1) not more than $17,000 on any person convicted of an offense under 18 U.S.C. § 2252(a)(4) or § 2252A(a)(5); (2) not more than $35,000 on any person convicted of any other offense for trafficking in child pornography; and (3) not more than $50,000 on any person convicted of a child pornography production offense. *The court shall consider the factors in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572 when ordering this assessment.* 18 U.S.C. § 2259A."

### CONCLUSION

107.    Mr. Corwin was raised in a very abusive home. His parents were both alcoholics (as is his brother). His childhood was an extremely sad one. He developed anxieties and depression which clearly progressed into adulthood. Academically he early on underperformed but managed to matriculate to college and earn an engineering degree. He was gainfully employed from 1976 until 1993, until he was medically unable to work any longer. He used marijuana daily since 1983 to cope with feelings of isolation and the related stresses/phobias - and adulthood brought him to valium usage to further cope. David has been socially isolated and has had very few friends in life.

108.    David's own sexual history is quite unremarkable, if at all even existent - there's not much to speak of. His diagnosed Chronic Fatigue Syndrome has been obtrusively burdening to this very day and should be treated further (care he will not receive adequately in a federal prison). He's a 74-year-old suffering from a 'prominent generalized anxiety disorder'. Significantly, nothing exists in the record to indicate Mr. Corwin ever once acted on the things he viewed, or ever would (to the contrary). Recidivist risks are widely known to be minimal to none with aging defendants and physician's assessments note that any risk level further reduces with sobriety. David Corwin needs drug/mental health treatment. Prison is going to do little for this sad, aged man.

109.    Neither physician's report/assessment indicates that David poses any threat to the public. Allowing a 74-year-old first time offender the right opportunities for treatment and rehabilitation seems most prudent (and compassionate in totality of circumstance) as real issues and options here. Mr. Corwin never pursued mental health treatment, but with the help of this Court, is finally doing so now. His has been a socially dysfunctional existence for a long time. He suffers very real neurological disorders.

110.    Mr. Corwin is 74-years old, has been suffering from a prominent generalized

anxiety disorder and major depression which has caused him to maintain a social distance from others. Based upon his life history David Corwin is accurately characterized as a passive isolationist with minimal recidivism risk. And even on a total longshot should Mr. Corwin ever relapse, it would involve a return to 'viewing' pornography on the internet as opposed to any sexual predatory behavior. Any extended prison sentence will do little for the real goals here. And a five-year statutory minimum accomplishes little as a deterrent or rehabilitative measure. Given his advanced age there is no reason to believe his docile behavior will ever change, especially given the long overdue psychiatric and sexual therapy he has finally begun now.

111.    PSR addendum notes at its conclusion: *"Defense Counsel did wish to point out that both Dr. DeSantis and Dr. Berrill concluded in their respective reports that there were no concerns about the defendant attempting to personally engage in sexual acts with minors and that he did not pose a danger to the community."* And concluding par104 of the PSR rightly states: *"The defendant is 74 years of age and described several health-related concerns. Your Honor may view the defendant's advanced age and his physical condition as a mitigating factor at sentencing."*

## COURT RECOMMENDATION TO FEDERAL BUREAU OF PRISONS FOR PRISON FACILITY DESIGNATION & PARTICIPATION IN RDAP

112.    **DESIGNATION RECOMMENDATION** - Pursuant to David Corwin's term of imprisonment, we respectfully urge the Court to provide a judicial recommendation to the Bureau of Prisons that, Mr. Corwin:

- Be designated to the Low-Security **Federal Prison at FCI Danbury, CT**[29] to remain as close to home and residence as possible. The *Federal Prison at FCI Danbury* is well suited

---

[29] In our opinion, the *low-security compound at FCI Danbury* is an ideal facility in which Mr. Corwin can benefit from the goals associated with a term of incarceration. It's close enough to home and residences to perhaps assist with any logistics maintaining such - and where perhaps his estranged brother will find it in his heart to come help with that intermittingly while David is away. *FCI Danbury* is generally a safe environment in the BOP system where it is hoped David will not be preyed upon by other inmates.

in both a decent and safe environment and having programming opportunities beneficial for Mr. Corwin achieving a successful rehabilitative outcome to a period of incarceration.

- Be transitioned back to the community through a Residential Re-Entry Center for the maximum period of pre-release allowed under the law.[30]

Thank you, Your Honor, for your kind and compassionate review in this case of David Corwin.

Dated: Mineola, New York
October 27, 2022

Respectfully submitted,

By: _____

**ANTHONY M. GRANDINETTE, ESQ.**
*Attorney for Defendant(s)*
114 Old Country Road, Suite 420
Mineola, New York 11501
Telephone: (516) 877-2889
Email: grandinettelaw@gmail.com

---

[30] Pursuant to the provisions and spirit of H.R. 1593, The Second Chance Act of 2007.

41